R. HOE & CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7216. Promulgated September 7, 1927.

1. Amounts received by petitioner in 1919 under agreements with the Navy Department canceling war-supply contracts are taxable under section 301(c) of the Revenue Act of 1918 as income from Government contracts.
2. Value of patents determined.

*Gordon Gordon,* Esq., *John Wallace Young,* Esq., *James Craig Peacock,* Esq., *Benjamin G. Paskus,* Esq., and *C. E. Koss,* Esq., for the petitioner.
*John D. Foley,* Esq., for the respondent.

In this proceeding the petitioner seeks a redetermination of the income and profits taxes for the year 1919, for which the Commissioner has determined a deficiency of $95,369.66. The petitioner alleges error on the part of the Commissioner (1) in the determination of the value of various patents at March 1, 1913, and the depreciation based thereon, and (2) in holding that the two items of $180,000 and $144,368, or any part thereof, were net income from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, and that such items, or any part thereof, were subject to tax under section 301(c) of the Revenue Act of 1918. A third issue presented in the petition was withdrawn by the petitioner at the hearing before the Board.

FINDINGS OF FACT.

The petitioner is a corporation organized under the laws of the State of New York.

Prior to 1910 the business of the petitioner was carried on by R. Hoe & Co., a partnership. On January 14, 1910, the business was taken over by R. Hoe & Co., a corporation organized under the laws of the State of New York, which continued actively in business from that time and during the years here at issue, and until October 1, 1924, when R. Hoe & Co., Inc., likewise a New York corporation, succeeded to the business.

On March 1, 1913, R. Hoe & Co. was the owner of various patents which were used in its business.

Patent No. 697558 was issued to R. Hoe & Co., partnership, on April 15, 1902, and assigned to R. Hoe & Co., corporation, March 19, 1910. Under this patent was manufactured what was popularly called the " x-pattern " printing press which was particularly adapted to " web " printing of newspapers. Prior to the issuance of this pat-

ent R. Hoe & Co., partnership, had been building a press known as the "right angle" or "angle bar" press. At about the same time the Goss Manufacturing Co. was producing what was described as a "straight line" or "decker" press, and the Scott Co. was also producing a "decker" press. These presses were the most important in the competitive field at that time. R. Hoe & Co. partnership, realizing that the "right angle" press was losing its popularity with the newspaper trade, purchased the patents of the Goss Manufacturing Co. for the "straight line" or "decker" press in 1901 for $250,000, but gave to the Goss Co. a license to manufacture presses under the patent for the remaining life of the patent of five or six years. The x-pattern press was an improvement over the presses existing at that time. It was superior to the Hoe right-angle press in being simpler in construction, less expensive to manufacture, in having easier access to essential parts, such as ink fountain and stereotype cylinders, in having smaller overall dimensions, and in requiring less cast iron and fewer parts. The saving in cast iron amounted to $60, and the saving in parts amounted to $435.59 for each 32-page unit. The number of units sold each year was as follows:

| | | | |
|---|---|---|---|
| 1902 | 1 | 1913 | 17 |
| 1907 | 8 | 1914 | 8 |
| 1908 | 4 | 1915 | 5 |
| 1909 | 2 | 1916 | 7 |
| 1910 | 14 | 1917 | 7 |
| 1911 | 15 | 1918 | 1 |
| 1912 | 27 | | |

This patent at March 1, 1913, had an unexpired term of 6.176 years and its fair market value was $75,000.

Patent No. 706269 was issued to R. Hoe & Co., partnership, August 5, 1902, and assigned to R. Hoe & Co., corporation, on March 19, 1910. Under this patent was manufactured what was termed "folders back to back." The features of this invention consist of a combination of web printing mechanisms arranged at opposite ends of the press, with folding and delivery mechanisms, facing in opposite directions in the space between. This arrangement provides convenient access to the printing and inking mechanisms and to the front of the folders and delivery mechanisms with ample space for convenient work. It also permitted the running of more units in either one or both of the folders, thereby getting a greater number of products and pages and various sections with different pages. This invention was supplementary to Patent No. 671061, dated April 2, 1901, and issued to W. Spalckhaver, which specifically applied to a plurality of mechanisms arranged one above the other at each end of the press with folding and delivery mechanisms in the space between them.

The customary selling price of a folder prior to March 1, 1913, was $5,000 and the customary cost of each folder was $2,416, resulting in a profit of $2,584 a folder.

Folders were sold with complete presses or separately. The petitioner's records show the sale of separate folders as follows:

| | | | |
|---|---|---|---|
| 1901 | 3 | 1910 | 3 |
| 1902 | 5 | 1911 | 2 |
| 1903 | 7 | 1912 | 7 |
| 1904 | 14 | 1913 | 1 |
| 1905 | 8 | 1914 | 1 |
| 1906 | 11 | 1915 | 1 |
| 1907 | 7 | 1916 | 2 |
| 1908 | 5 | 1917 | 1 |
| 1909 | 4 | | |

The patent, at March 1, 1913, had an unexpired term of 6.433 years and its fair market value was $60,000.

Patent No. 746297 was issued to Amandus H. Cruse on December 8, 1903, and by assignment to Robert Hoe, and was assigned to R. Hoe & Co., corporation, March 19, 1910. This invention has for its object the production of a machine by which the bevels on both sides of the rim of each socket made for the insertion of the cutting teeth of a circular saw may be made simultaneously. This machine is greater in accuracy in making bevels due to the automatic stopping devices, and to the ease of inspection. It also resulted in the saving of time and labor. The saving in time was estimated at 5.1 hours in milling a saw of 40 teeth. The wage and manufacturing burden was 47¢ an hour on March 1, 1913. The average annual number of saws of 40 teeth manufactured and sold from 1903 to 1920 was 2,400. The anticipated annual saving at March 1, 1913, was $5,752.80. This patent at March 1, 1913, had an unexpired term of 7.775 years and had a fair market value of $27,000.

Patent No. 752807 was issued to William Spalckhaver February 23, 1904, and by assignment to Robert Hoe, and was assigned to R. Hoe & Co., corporation, March 19, 1910. This invention, called an "upper former," relates to a web printing machine for printing a plurality of webs simultaneously, the especial object of the invention being to provide a compact high speed machine with direct and short runs of the webs which shall be capable of producing a large variety of products delivered at convenient points. The upper former enabled presses to be operated at a greater speed, inasmuch as it obviated running many thicknesses of web or paper over the main folders and thus did away with many chokes and stoppages. The upper former might be built with a press or added to an old one.

The extra formers manufactured and sold each year were as follows:

| | | | |
|---|---|---|---|
| 1904 | 2 | 1913 | 12 |
| 1905 | 6 | 1914 | 2 |
| 1906 | 2 | 1915 | 2 |
| 1907 | | 1916 | 4 |
| 1908 | | 1917 | 24 |
| 1909 | 16 | 1918 | 4 |
| 1910 | | 1919 | 2 |
| 1011 | | 1920 | 12 |
| 1912 | 4 | | |

According to the records of the petitioner the price of the former when sold separately was $1,250 and the average cost of production was $942 at March 1, 1913, resulting in a profit of $308 each. The patent at March 1, 1913, had an unexpired term of 7.987 years and a value of $18,000.

Patent No. 803422 was issued to H. C. MacConnell on October 31, 1905. It was purchased by Robert Hoe on April 28, 1909, for a cash consideration of $12,000. It was vested in R. Hoe & Co., corporation, in January, 1910, but was not formally assigned to it until June 27, 1921.

This invention had as its object the construction of a simple and compact machine for finishing stereotype-plates, particularly the curved stereotype-plates used in printing newspapers and books.

The devices manufactured and sold each year were as follows:

| | | | |
|---|---|---|---|
| 1909 | 7 | 1916 | 12 |
| 1910 | 14 | 1917 | 8 |
| 1911 | 15 | 1918 | 5 |
| 1912 | 28 | 1919 | 7 |
| 1913 | 35 | 1920 | 13 |
| 1914 | 18 | 1921 | 6 |
| 1915 | 7 | 1922 | 12 |

The average selling price of this machine was $2,250 and the average cost of manufacture was $1,524 each, according to the records of the petitioner, resulting in a profit of $726 for each machine.

This patent at March 1, 1913, had an unexpired term of 9.669 years and a fair market value of $37,500.

Patent No. 830527 was issued to Robert Hoe as assignee of George F. Read September 11, 1906, and was assigned to R. Hoe & Co., corporation, March 19, 1910. This invention had as its object the production of a printing cylinder which was stiff and rigid and at the same time comparatively light and well balanced. The cylinder has a central hub extending from end to end, connected to this rim by webs running the length of the cylinder.

Tubular cylinders manufactured and sold each year under this patent were as follows:

| | | | |
|---|---:|---|---:|
| 1910 | 432 | 1918 | 102 |
| 1911 | 662 | 1919 | 172 |
| 1912 | 324 | 1920 | 298 |
| 1913 | 302 | 1921 | 208 |
| 1914 | 316 | 1922 | 303 |
| 1915 | 70 | 1923 | 361 |
| 1916 | 400 | 1924 | 268 |
| 1917 | 24 | 1925 | 280 |

The saving in cost, time, labor and materials in manufacturing this cylinder as compared to the manufacture of the cylinder previously produced was—

| | |
|---|---:|
| Foundry, 11 hours at $0.68 | $7.48 |
| Machine shop, 11½ hours, at $0.68 | 6.82 |
| 171 pounds of metal at $0.03 | 5.15 |
| Total | 20.43 |

This patent at March 1, 1913, had an unexpired term of 10.534 years and a fair market value of $53,000.

Patent No. 837345 was issued to Robert Hoe, as assignee of Louis A. Schmidt, December 4, 1906, and was assigned to R. Hoe & Co., corporation, March 19, 1910. This invention has as its object the production of a simple reversible couple for use in printing machines, consisting of two cylinders; the arrangement being such that no adjustment of one part of the impression-cylinder with respect to the other part is necessary when the couple is reversed, and the elimination of shiftable plate-retaining devices. By the use of devices for retaining forms on the printing cylinder, side by side, adjacent form surfaces may be staggered by an amount equal to one-half the circumferential length of a form, and a couple may be run in either direction without changing the position of the retaining devices. This device is referred to as "90 degree staggered cylinders." By the use of this device innumerable color printing combinations were made possible, which gave the petitioner a strong position in the color press field. It also resulted in the elimination of one impression cylinder with its housings and saved manufacturing cost to that extent.

Cylinders saved by this device each year are as follows:

| | | | |
|---|---:|---|---:|
| 1912 | 12 | 1920 | 8 |
| 1913 | 10 | 1921 | 52 |
| 1914 | 32 | 1922 | 114 |
| 1915 | 12 | 1923 | 95 |
| 1916 | 12 | 1924 | 62 |
| 1917 | — | 1925 | 63 |
| 1918 | — | 1926 | 43 |
| 1919 | 6 | | |

The saving per cylinder as at March 1, 1913, was $307.20.

This patent at March 1, 1913, had an unexpired term of 10.764 years and a fair market value of $22,500.

Patent No. 893990 was issued to Frank E. Ellis and Robert A. Hasselbach on July 21, 1908. A one-half interest in this patent became vested in R. Hoe & Co., corporation, by assignment about April 6, 1911, as a result of the purchase of the interest of R. A. Hasselbach. This invention known as the "Hasselbach Clamp," relates to means for securing the printing plates to the plate cylinders of web presses. It consists of a clip which can be adjusted and clamped against the printing plate by a single actuator in one operation and which engages practically the entire end of the plate with a uniform pressure.

The number of devices manufactured and sold under this patent are as follows:

| | |
|---|---:|
| 1911 and 1912 | 952 |
| 1912 and subsequently | 19,000 |

The cost of manufacturing the device was $12.06 each. The Goss clamp, the chief competitor of the clamp in question, cost $87.91 each to manufacture at March 1, 1913. The sale price of the Hasselbach clamp was $37.50, indicating a profit to the petitioner of $25.44 a clamp.

This patent on March 1, 1913, had an unexpired term of 12.392 years and petitioner's interest had a fair market value of $45,000.

Patent No. 946721 was issued to G. M. Clark, Jr., on January 18, 1910, and Patent No. 992853 was issued to G. M. Clark, Jr., May 23, 1911. Both patents were assigned to R. Hoe & Co., corporation, January 27, 1913. The two patents relate to ingot-casting machines whereby linotype, monotype and stereotype plates may be melted and the molten type metal cast into ingots of a convenient size to place in the melting pots of linotype and monotype machines. This device enabled the operator to cast ingots 10 times faster than by the older method of hand pouring and removed the "fins" or sharp edges produced by overflow of metal.

The number of machines manufactured and sold under this patent is given as follows:

| | | | |
|---|---:|---|---:|
| 1913 | 17 | 1920 | 15 |
| 1914 | 8 | 1921 | 9 |
| 1915 | 3 | 1922 | 8 |
| 1916 | 10 | 1923 | 9 |
| 1917 | 7 | 1924 | 12 |
| 1918 | 8 | 1925 | 8 |
| 1919 | 10 | 1926 | 2 |

As at March 1, 1913, the selling price of this machine was $250 and the cost of manufacture $115, resulting in a profit of $135 for each machine.

The patents at March 1, 1913, had an average unexpired term of 14.559 years and a fair market value of $15,000.

Patent No. 985461 was issued to Edward P. Sheldon and by mesne assignments transferred to R. Hoe & Co., corporation, February 28, 1911. Patent No. 993649 was issued to George W. Church and by mesne assignments transferred to R. Hoe & Co., corporation, May 30, 1911. These inventions have to do with stapling mechanism and more particularly that class in which staples are inserted in webs or sheets while they are in motion.

The number of devices sold under these patents by the petitioner were as follows:

| | | | |
|---|---|---|---|
| 1911 | 2 | 1919 | 1 |
| 1912 | 14 | 1920 | 7 |
| 1913 | 14 | 1921 | -- |
| 1914 | 4 | 1922 | 5 |
| 1915 | 4 | 1923 | 2 |
| 1916 | 7 | 1924 | 10 |
| 1917 | 10 | 1925 | 7 |
| 1918 | 1 | 1926 | 2 |

As of March 1, 1913, each machine sold for $2,500, and was manufactured at an estimated cost of $900, resulting in a profit of $1,600 each.

These patents on March 1, 1913, had an average unexpired term of 15.625 years and a combined fair market value of $30,000.

Patent No. 1008528 was issued to Amandus H. Cruse and assigned by mesne assignments to R. Hoe & Co., corporation, November 14, 1911. Patent No. 1008556 was issued to George E. Pancoast and assigned to R. Hoe & Co., corporation, November 14, 1911. These patents deal with a matrix drying press. By the use of this press it is possible to save two minutes in the drying of a matrix and also produce a mat of a quality superior to those previously produced.

At March 1, 1913, the selling price of a matrix drying press was $476 and its average estimated cost of manufacture was $223, resulting in a profit of $253 each.

The number of machines manufactured and sold by the petitioner under these patents were as follows:

| | | | |
|---|---|---|---|
| 1911 | 82 | 1919 | 42 |
| 1912 | 74 | 1920 | 102 |
| 1913 | 66 | 1921 | 68 |
| 1914 | 45 | 1922 | 51 |
| 1915 | 38 | 1923 | 26 |
| 1916 | 55 | 1924 | 47 |
| 1917 | 27 | 1925 | 47 |
| 1918 | 16 | | |

These patents at March 1, 1913, had an average unexpired term of 15.709 years and a combined fair market value of $75,000.

During the year 1918 the petitioner's plant was largely devoted to the manufacture of ordnance for the Government. This work was being performed under several contracts with the Navy Department. Two of these contracts dated respectively September 28, 1917, and March 11, 1918, were only partially completed at the time of the signing of the Armistice. The Government finding it of public interest to cancel the uncompleted portions of these two contracts, shortly after November 11, 1918, directed that further work be suspended, and entered upon negotiations with the petitioner for their cancellation. As a result of these negotiations an agreement was entered into as follows:

AGREEMENT made and concluded this sixth day of February, 1919, pursuant to authority granted by the naval appropriation act approved July 1, 1918, by and between R. Hoe and Company, a corporation organized under the laws of the State of New York, and doing business at 504 Grand Street, New York in the State of New York, party of the first part, hereinafter called the contractor, and the United States, represented by the Secretary of the Navy, party of the second part, hereinafter called the Department:

WHEREAS, The Department finds it necessary in the public interest that the contract dated March 11, 1918, by and between the parties hereto, requiring the furnishing by the said contractor of two hundred and fifty (250) three-inch anti-aircraft gun mounts, Mark XI, Mod. 2, with sights, Mark XVI, Mod. 1 (except telescopes), be cancelled, and

WHEREAS, The basis of compensation to be allowed and paid the contractor under said original contract and this agreement has been determined and agreed upon as hereinafter set forth:

Now, THEREFORE, This agreement witnesseth that in consideration of the premises and for and in consideration of the payments to be made as hereinafter provided, the aforesaid contract is hereby cancelled and superseded by the provisions hereof as follows:

(a) No further work shall be done towards production of said gun mounts.

(b) The contractor shall receive compensation, in addition to payments already made, as follows:

(1) Payment shall be made of the sum of $345,538.68 covering the proportionate value of work done on completed and partially completed parts and materials (including material furnished by the contractor) in accordance with the schedule of values attached to the original contract.

(2) Payment shall be made of the sum of $93,898.67, made up as follows:— $86,268.81 for jigs, fixtures, tools, gauges and templates furnished by the contractor additional to the $90,000.00 already paid on this account, and $7,629.85 for motors procured by the contractor for the Department owned machinery.

(3) Payment shall be made of cost of segregating, inventorying, boxing and shipping of unfinished parts and materials.

(4) Payment shall be made of the sum of $9766.43 covering the extra cost of changes under the original contract ordered by the Bureau of Ordnance, ($4373.24), and the advance in wages as approved by the Navy Department letter of July 6, 1918, ($5393.19).

(5) Payment shall be made of the sum of $144,368.00 (ten per cent of the amount of the contract less the contract value of materials furnished by the

Government) to cover expenses and loss to the contractor in rearranging and returning to its regular line of manufacture.

(c) Payment shall be made in the amount of just settlements with subcontractors, subject to prior approval by the Bureau of Ordnance in each case.

(d) Deduction shall be made for such motors and machine tools furnished by the Department for use under said contract as may be retained by the contractor at prices to be agreed upon by the contractor and the Bureau of Ordnance.

(e) Payments shall be made from time to time as the amounts falling due are finally determined upon and approved by the Bureau of Ordnance.

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, all the provisions of the contract shall be and remain in full force and effect. Nothing contained in this agreement or done or required under its terms shall operate to annul, release, or otherwise affect the validity of any bond given in connection with said contract, but said bond shall remain in full force and effect in the same manner, and with like effect as if the modifications provided for herein had been made a part of the original contract at the time of its execution, and the surety under said bond shall, and by signing hereby does consent to this agreement for the purpose of extending its obligation to the modifications aforesaid.

A second agreement was later entered into as follows:

AGREEMENT made and concluded this twenty-third day of August, nineteen hundred and nineteen, pursuant to authority granted by the naval appropriation act approved July 1, 1918, by and between R. Hoe and Company, a corporation organized under the laws of the State of New York, and doing business at 504 Grand Street, New York in the State of New York, party of the first part, hereinafter called the contractor, and the United States, represented by the Secretary of the Navy, party of the second part, hereinafter called the Department:

WHEREAS, The Department finds it necessary in the public interest that the contract dated September 28, 1917 and supplemental agreement thereto dated March 28, 1918, by and between the parties hereto, requiring the furnishing by the said contractor of 200 four-inch gun mounts, Mark XII, Mod. 3, complete, with sights Mark XXI (except telescopes) and spare parts be cancelled in part and modified, and

WHEREAS, All work in connection with this contract was stopped, on instructions from the Bureau of Ordnance, on December 15, 1918, and

WHEREAS, The basis of compensation to be allowed and paid the contractor under said original contract and supplemental agreement thereto dated March 28, 1918 and this agreement has been determined and agreed upon as hereinafter set forth:

Now, THEREFORE, THIS AGREEMENT WITNESSETH, That in consideration of the premises and for and in consideration of the payments to be made as hereinafter provided, the aforesaid contract and supplemental agreement thereto dated March 28, 1918 are hereby cancelled in part and superseded by the provisions hereof as follows:

1. No further work shall be done towards production of said gun mounts.

2. All materials provided especially for the purposes of said contract but not in excess of the total quantities originally provided for shall be taken over by the Department and paid for as follows:

(a) Raw materials shall be paid for at cost plus a handling charge of 10%.

(b) Completed parts shall be paid for at their relative value under the contract in accordance with a schedule to be agreed upon and approved by the Bureau of Ordnance.

(c) Parts in process shall be paid for at the price of materials under (a) plus an amount corresponding to the percentage of work done thereon, predicated on the approved values of parts under (b) less (a).

(d) Payment shall be made at cost for materials in the hands of subcontractors.

3. Payment shall be made of the cost of changes ordered by the Bureau of Ordnance, included in manufacture prior to the date work was stopped (December 15, 1918).

4. Payment shall be made of the portion of cost of jigs, fixtures, special tools and gauges procured especially for the purposes of said contract and properly assignable to the cancelled portion thereof, all such materials to become the property of the Department.

5. Payment shall be made of an amount equal to the difference between the agreed present value (50% of actual cost) and the actual cost of that portion of new equipment procured especially for the purposes of said contract and properly assignable to the cancelled portion thereof.

6. Payment shall be made of an amount equal to the difference between the present value, to be agreed upon, and the actual cost of special storage facilities and the use thereof, provided especially on account of said contract, and of rearrangement of plant incident to this gun mount work and properly assignable to the cancelled portion thereof.

7. Payment shall be made of $180,000 to cover expenses and loss to the contractor incident to the sudden cessation of work and return to its regular line of manufacture, provided that prior to the payment of this amount, a final release shall be given by the contractor to the Department of all claims arising under or on account of said original contract and the partial cancellation thereof, and of this agreement.

8. Payment shall be made of the cost of segregating, inventorying, packing and shipping all materials which become the property of the Department (except finished parts which shall be delivered f. o. b. railroad), provided that such materials as may be mutually agreed upon shall be retained by the contractor at their fair present value to be determined upon and approved by the Bureau of Ordnance.

9. No liquidated damages shall be assessed under said contract.

10. Payments shall be made from time to time as the amounts becoming due are finally determined upon and approved by the Bureau of Ordnance, provided that the advance payment of $250,000, including interest thereon at 4½% per annum to December 3, 1918, made in accordance with supplemental agreement dated March 28, 1918, shall be repaid by deduction from any payment or payments falling due under this agreement, instead of as provided in the supplemental agreement under which said advance payment was made.

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, all the provisions of the said original contract and supplemental agreement thereto dated March 28, 1918, shall be and remain in full force and effect. Nothing contained in this agreement or done or required under its terms shall operate to annul, release, or otherwise affect the validity of any bonds given in connection with said contract and supplemental agreement thereto dated March 28, 1918, but said bonds shall remain in full force and effect in the same manner, and with like effect as if the modifications provided for herein had been made a part of the original contract at the time of its execution, and the sureties under said bonds shall, and by signing hereby do, consent to this agreement for the purpose of extending their obligation to the modifications aforesaid.

At various times during 1919 and in accordance with these two agreements all the amounts specified therein were paid by the Government. The petitioner in its tax return for 1919 reported $560,980.23 as its net income from war contracts under section 301(c) of the Revenue Act of 1918, this amount representing all payments except those provided under paragraph (b)(5) of the agreement of February 6, 1919, and paragraph (7) of the agreement of August 23, 1919.

The Navy Department vouchers listed the amounts set forth in the agreement under the headings of each paragraph or subparagraph. The voucher item covering payment under paragraph (b)(5) reads: " For payment to cover expense and loss to the contractor in rearranging and returning to its regular line of manufacture $144,368.00."

The voucher item covering payment under paragraph 7 reads: " For expense and loss to contractor incident to the sudden cessation of work and return to its regular line of manufacture $180,000.00."

### OPINION.

ARUNDELL: The petitioner claims a value for 14 patents on March 1, 1913, of $1,438,497, and an allowance for exhaustion based thereon of $117,193 for the year 1919. In support of this claim it introduced testimony setting forth in respect to certain patents the profits realized from the manufacture and sale of the articles, and in respect to other patents the savings in labor or materials by the manufacture or use of the patented devices. In further support of this claim it introduced a witness who was very familiar with the invention, design, manufacture, operation, and sale of printing presses and the accessory devices used therewith.

The figures thus introduced, the various patents, and the unexpired lives at March 1, 1913, are as follows:

| Patent No. | Life after Mar. 1, 1913, in years | Prospective savings after Mar. 1, 1913 | Prospective profits after Mar. 1, 1913 | Values given by expert witnesses |
|---|---|---|---|---|
| 697558 | 6.126 | $30,961.62 | | $250,000 |
| 706269 | 6.443 | | $119,373.62 | 200,000 |
| 746297 | 7.775 | 44,756.78 | | Not given |
| 752807 | 7.987 | | 8,771.84 | 60,000 |
| 803422 | 9.669 | | 115,789.01 | 125,000 |
| 830527 | 10.534 | 101,781.07 | | 150,000 |
| 837345 | 10.764 | 34,025.95 | | 75,000 |
| 803990 | 12.392 | | 150,157.06 | 300,000 |
| 946721 | ¹14.559 | | 17,788.82 | 50,000 |
| 992853 | | | | |
| 985461 | ¹15.825 | | 204,000.00 | 100,000 |
| 993649 | | | | |
| 1008528 | ¹15.709 | | 295,415.44 | 250,000 |
| 1008536 | | | | |

¹ Average.

108346°—28——84

The evidence discloses no purchases or sales of patents by the expert called on behalf of petitioner nor a firsthand knowledge on his part of sales of patents other than those related herein. He gave no basis for his valuation and offered no data or figures that would appeal to a prospective purchaser. In fact he admitted that he had no basis other than his judgment. Nor were the purchases testified to very helpful in reaching our conclusion. The evidence relating to the purchase of the patents covering the manufacture of a "straight line" press from the Goss Company in 1901 for $250,000, is not sufficient to warrant us in using this transaction as a basis in reaching the value to be placed upon the press.

Patent No. 803422, known as the stereotype finishing machine, was issued to H. C. MacConnell in 1905 and purchased in 1909 for $12,000 by petitioner four years after the invention had been a matter of public record. The expert valued this patent as of March 1, 1913, at $125,000, an increase over its purchase price of over 1,000 per cent. A one-half interest in the Hasselbach clamp was purchased in 1911 for an amount less than what the stereotype machine cost and this patent was valued on March 1, 1913, by the expert witness at $300,000, an increase in value of approximately 3,000 per cent. This patent had been of public record for three years at the time of its purchase.

A patent can have value to a corporation only in so far as benefits flow into the corporation on account of the ownership of or interest in such patent. No prudent investor would invest in a patent unless he foresaw that the ownership thereof would result in profit to himself. These profits may result from the manufacture and sale of a patented article, or from savings in cost of manufacture of an article, or they may result from continued sales of one article by excluding from the market a competing patented article. Without knowledge of some basis of benefits flowing directly or indirectly to a company through the ownership of or rights in a patent it is inconceivable to us how an expert can arrive at the value of such patent.

The entire profits on the patents listed are not, in our opinion, properly assignable to the patents themselves, since part of such profits should go to pay the interest on the plant and equipment used in its manufacture and part is assignable to human ingenuity, management, and advertising. Only the balance is assignable to patents and should be considered in arriving at the fair market value. The petitioner has furnished us no statement as to its tangible assets or other intangible assets, nor any basis on which to apportion a part of the profits attributed to patented articles to such assets.

The savings resulting in manufacturing an article, due to the use of a patent are the nearest approach to a direct measure of value of

any of the bases presented. Yet the total expected savings do not represent the market value of a patent on a specific date for no prudent purchaser would pay for a patent an amount equal to such gross savings since he would thereby lose the interest on the money he invests.

After a consideration of the testimony of the witnesses, the comparative values of the patents shown by such testimony, the position which the patents gave the petitioner in its field, the remaining life of each patent, and the savings in manufacturing costs and profits resulting from the use of the patents, we have arrived at the figures set forth in the findings of fact as representing the fair market values of the several patents as of March 1, 1913.

These patents are subject to exhaustion, and the petitioner is entitled to a deduction for the year 1919 based upon the values of such patents ratably apportioned over the respective unexpired terms of such patents. *Appeal of Union Metal Manufacturing Co.*, 4 B. T. A. 287.

The remaining issue relates to the treatment to be accorded certain amounts received in settlement of canceled Government contracts. The petitioner reported as income from war contracts all of the amounts set forth in the agreement of settlement except $180,000 covered by paragraph 7 of the agreement of August 23, 1919, and $144,368 covered by paragraph (b) (5) of the agreement of February 6, 1919. These two amounts, the petitioner claims, were not income from war contracts, but were advances to cover expenses which it would incur in rearranging its plant and business to its regular line of manufacture.

We have previously passed on a similar issue in the case of *A. B. Kirschbaum Co.*, 5 B. T. A. 65. In that case an additional award of $109,615.60 was made as " reasonable remuneration for expenditures and obligations or liabilities necessarily incurred in performing or preparing to perform said agreement." We fail to see any distinction between the character of this award and the character of the two sums involved in this proceeding. The wording of that portion of the agreement is slightly different, but it is apparent that the bases for the awards were the same. The arguments used in the *Kirschbaum* case apply equally to this case.

Petitioner also urges that in any event the sum of $324,368 was not a proper addition to *net* income attributable to war contracts, and that the expenses incident to putting the plant into condition for peace time operation should be applied against it. But it is not necessary for us to decide this question, since we are without competent evidence as to the nature and amount of the expenditures. Accordingly, we are of the opinion that the Commissioner was cor-

rect in determining that the two amounts totaling $324,368 were income from Government contracts made between April 6, 1917, and November 11, 1918, and were subject to tax under section 301(c) of the Revenue Act of 1918.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*